Filed 4/15/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MICHAEL B. BURCH et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CERTAINTEED CORPORATION, <br><br> Defendant and Appellant. | A151633, A152252 <br><br> (Alameda County <br> Super. Ct. No. RG16819332) |
| MICHAEL B. BURCH et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CERTAINTEED CORPORATION, <br><br> Defendant and Appellant. | A153624 <br><br> (Alameda County <br> Super. Ct. No. RG16819332) |

Plaintiffs Michael and Cindy Burch sued defendant CertainTeed Corporation, an asbestos-cement (A/C) pipe manufacturer, after Michael Burch contracted mesothelioma following many years of installing A/C pipe throughout California. After trial, the jury returned a verdict for plaintiffs Michael and Cindy Burch on their claims against CertainTeed Corporation for negligence, failure to warn, strict product liability, intentional concealment, and intentional misrepresentation. The court entered judgment for plaintiffs holding defendant 100 percent liable for plaintiffs' economic damages and 62 percent liable for their noneconomic damages according to the jury's fault apportionment. The court granted judgment notwithstanding the verdict (JNOV) on

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication except for parts II. C and E.

1

plaintiffs' intentional misrepresentation claim and denied JNOV on plaintiffs' intentional concealment claim.

On appeal, plaintiffs argue that substantial evidence supports the jury's verdict on intentional misrepresentation, and that the court erred in allocating noneconomic damages according to defendant's proportion of fault because Civil Code section 1431.2[1] (Proposition 51) does not eliminate an intentional tortfeasor's joint and several liability for noneconomic damages. On cross-appeal, defendant argues that plaintiffs failed to introduce substantial evidence of intentional concealment, and that the trial court committed prejudicial error by failing to give a special jury instruction on the duty of Michael Burch's employers to provide a safe workplace. In a consolidated appeal, defendant also challenges the trial court's postjudgment denial of defendant's motion to compel plaintiffs to execute acknowledgment of partial satisfaction of judgment.

We shall affirm the court's order granting in part and denying in part the JNOV. In the unpublished portions of this opinion, we reject defendant's arguments regarding the special jury instruction and its motion to compel plaintiffs' execution of acknowledgment of partial satisfaction of judgment. In addition, we reverse the judgment because we hold that Proposition 51 does not eliminate an intentional tortfeasor's joint and several liability for noneconomic damages.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Throughout the 1970's, Michael Burch (Burch) worked in California installing A/C pipe. From 1970 to 1978, Burch worked mainly for J.C. Plumbing, a family-owned business, laying underground A/C pipe. He also worked for Valley Engineers around 1980. Until the mid-1970's, Burch installed A/C pipe mostly at mobile home parks, and then he began working on utility pipeline public works jobs. In 1978, Burch worked for J.C. Plumbing installing new A/C pipe throughout the City of Cambria, which was a large job.

---

[1] All further references are to the Civil Code unless otherwise specified.

Defendant shared the U.S. market for A/C pipe with Johns-Manville and a few other brands, including Kubota and Nipponite. Before the Cambria job, Burch worked with various brands of A/C pipe, but the majority of his work was with defendant's pipe. In Cambria, Burch worked only with defendant's pipe. Defendant's A/C pipe contained 14 percent to 15 percent asbestos, including chrysotile and crocidolite asbestos, with crocidolite being the most carcinogenic. Burch later contracted mesothelioma, and he and his wife subsequently sued defendant and numerous other defendants asserting negligence, failure to warn, strict product liability, and intentional tort claims.

Plaintiffs' case proceeded to jury trial against defendant only, and the jury returned a special verdict for plaintiffs on their claims for negligence, failure to warn, strict product liability, intentional misrepresentation, and intentional concealment.[2] The jury awarded plaintiffs $776,201 in economic damages and $9.25 million in non-economic damages. It apportioned the fault of defendant and other joint tortfeasors as follows: 62 percent fault to defendant; 25 percent fault to Johns-Manville; 10 percent fault to J.C. Plumbing; 1 percent fault to Valley Engineers; 1 percent fault to Kubota; and 1 percent fault to Nipponite. The court entered judgment for plaintiffs, finding defendant liable for 100 percent of their economic damages ($776,201) and 62 percent of their noneconomic damages ($5.735 million); plaintiffs served defendant with notice of entry of judgment on March 21, 2017.

Defendant timely filed a motion for a new trial and for JNOV on plaintiffs' intentional concealment and misrepresentation claims. Plaintiffs, in turn, brought a motion to amend the judgment, arguing that Proposition 51 does not allow allocation of noneconomic damages according to a tortfeasor's proportion of fault if the tortfeasor committed an intentional tort.

The trial court denied defendant's motion for a new trial. On May 18, 2017, it denied defendant's motion for JNOV on intentional concealment, but granted the motion

---

[2] For the sake of efficiency, we do not summarize all the evidence introduced at trial, and instead set forth only the evidence relevant to the issues presented in this appeal as we address each issue.

on intentional misrepresentation. On June 9, 2017, plaintiffs appealed, and on June 13, 2017, defendant filed a cross-appeal. On July 14, 2017, the trial court granted plaintiffs' motion to amend the judgment to eliminate defendant's proportionate fault reduction for noneconomic damages. On August 7, 2017, the court entered an amended judgment for plaintiffs holding defendant 100 percent liable for plaintiffs' economic damages ($776,201) and noneconomic damages ($9.25 million). Defendant appealed from this amended judgment, and plaintiffs cross-appealed.

Meanwhile, defendant attempted to partially satisfy the judgment. Plaintiffs rejected defendant's check; thereafter, plaintiffs moved to challenge the sufficiency of defendant's appellate bond, and defendant moved to compel plaintiffs to execute an acknowledgement of partial satisfaction of judgment. Defendant appealed the denial of its motion, and this court consolidated all of the parties' appeals.

## II. DISCUSSION

### A. *Appellate Jurisdiction*

This case presents two jurisdictional questions that must be addressed before the merits. First, the court entered two judgments, and there can only be one final judgment. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2018) ¶ 2.21.) So, we must decide which is the final judgment and whether appellate jurisdiction exists over that judgment. Second, we must resolve plaintiffs' challenge to our jurisdiction over defendant's appeal of the court's order partially denying its motion for JNOV.

#### 1. The Judgments

The court entered a judgment on March 20, 2017 and an amended judgment on August 7, 2017. With respect to the first judgment, defendant timely moved for JNOV, and the parties timely appealed within 30 days of the trial court's service of its order granting in part and denying in part defendant's motion. Because the parties timely appealed from the original judgment, we have jurisdiction unless the amended judgment became the operative judgment.

4

After a judgment is entered, although clerical errors may be corrected at any time (Code Civ. Proc., § 473, subd. (d)), the only way for a court to correct judicial error is on a motion for new trial or on a motion under Code of Civil Procedure section 663 to vacate the judgment and enter a different one. (*Greene v. Superior Court* (1961) 55 Cal.2d 403, 405–406.) A clerical error results when the order or judgment misstates the court's actual intent (i.e., error in recording the judgment rendered), and judicial error results when the order or judgment entered was intended, even though based on an error of law (i.e., error in rendering the judgment). (*Rochin v. Pat Johnson Manufacturing Co*. (1998) 67 Cal.App.4th 1228, 1237–1238.)

The change in the amended judgment here was not a simple clerical change. The record reflects that the trial court intended to enter the original judgment according to the jury's findings, although the court anticipated making a future final decision on the applicability of section 1431.2. The amended judgment increased defendant's liability for noneconomic damages by more than $3 million. This correction "materially affect[s] the substantial rights of the part[ies]" and had to occur under Code of Civil Procedure section 663. (See Code Civ. Proc., § 663.)

Under the operative law at the time, the court's power to rule on a motion under Code of Civil Procedure section 663 expired 60 days from the clerk's mailing of the notice of entry of judgment or service upon the moving party of written notice of entry of judgment, whichever was earlier, or if that notice was not given, 60 days after the filing of the first notice of intention to move to set aside and vacate the judgment. (Code Civ. Proc., former § 663a, subd. (b), added by Stats. 2012, ch. 83, § 2.)[3] If the motion was not determined within the requisite time, it was deemed denied without further court order. (*Ibid*.) This time limit, like that governing a ruling on a motion for a new trial, is jurisdictional, and any judgment entered thereafter is void. (*Garibotti v. Hinkle* (2015) 243 Cal.App.4th 470, 482–483.)

---

[3] Pursuant to Assembly Bill No. 2230 (2017–2018 Reg. Sess.), effective January 1, 2019, the deadlines under Code of Civil Procedure section 663a, subdivision (b), were changed to 75 days. (Stats. 2018, ch. 317, § 2.)

Here, the trial court did not rule on plaintiffs' motion until July 14, 2017, well after the 60-day time limit passed on June 5, 2017.[4] As such, plaintiffs' motion was deemed denied without further court order, and the amended judgment is void. (*Garibotti, supra*, 243 Cal.App.4th at pp. 476–477, 483.) Moreover, a stay was in place by virtue of the parties' perfected appeals. (Code Civ. Proc., § 916, subd.(a).) We thus have jurisdiction to review the appeals from the original judgment.

2. The JNOV Order

Plaintiffs argue that defendant's notice of appeal did not properly specify an appeal from the court's May 18, 2017 order denying in part its JNOV motion, so we lack jurisdiction to review this order. On its notice of cross-appeal on Judicial Council form APP-002, defendant wrote that it appealed from a judgment or order entered March 20, 2017, and it checked two boxes indicating appeal from a judgment after jury trial and an order or judgment under Code of Civil Procedure section 904.1, subdivision (a)(3)–(13). Defendant contends that a liberal construction of this notice permits our exercise of jurisdiction, and we agree.

An order denying a party's motion for JNOV is separately appealable. (Code Civ. Proc., § 904.1, subd. (a)(4).) A party's notice of appeal must identify the order or judgment appealed; however, the notice must be liberally construed. (Cal. Rules of Court, rule 8.100(a)(2).) Where a party seeks to challenge an appealable order issued after a judgment, such as an order granting a new trial, the filing of a notice of appeal from the judgment alone is insufficient to grant jurisdiction over the separately appealable order. (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 239 (*Sole*).) However, a notice is sufficient " 'to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the

---

[4] The record shows that plaintiffs mailed a notice of entry of judgment to defendant, but it does not show that plaintiffs were served with a notice of entry of judgment or that such document was mailed by the clerk. Plaintiffs' April 5, 2017 filing of their motion to amend the judgment started the running of the 60-day time period.

respondent could not possibly have been misled or prejudiced.' " (*In re Joshua S.* (2007) 41 Cal.4th 261, 272.)

It is reasonably apparent that defendant sought to appeal the order denying JNOV, as well as the judgment. Unlike in *Sole*, defendant did not singularly appeal from the judgment. Defendant instead marked an additional box indicating an appeal under Code of Civil Procedure section 904.1, subdivision (a)(3)–(13). Plaintiffs were aware of the order partially denying JNOV, they do not argue that other appealable orders caused confusion over which order defendant appealed, and they do not show prejudice. In these circumstances, we liberally construe the notice of cross-appeal and exercise jurisdiction over the court's order partially denying JNOV.

B.      *The Parties' Appeals of the JNOV Order*

The trial court's power to grant JNOV is the same as its power to grant a directed verdict. (Code Civ. Proc., § 629.) " 'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.' " (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.) If there is any substantial evidence, contradicted or uncontradicted, to support the verdict, we affirm the verdict. (*Ibid.*) Substantial evidence is that of a "ponderable legal significance, reasonable, credible, and of solid value." (*Jorge v. Culinary Institute of America* (2016) 3 Cal.App.5th 382, 396.) The "focus is on the quality, not the quantity of the evidence." (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871.) We resolve all evidentiary conflicts and indulge all reasonable inferences in support of the judgment. (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308.)

1.      Substantial Evidence Supports the Jury's Verdict for Concealment

The elements of fraudulent concealment are: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and would not have acted

7

as he did if he had known of the concealed or suppressed fact; and (5) as a result of the concealment or suppression of the fact, the plaintiff sustained damage. (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 310–311.) Defendant claims insufficient evidence supports the elements of a duty to disclose, causation, actionable concealment, intent to deceive, and reliance.

As a preliminary matter, we presume that the " 'record contains evidence to sustain every finding of fact.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) It is the appellant's burden to demonstrate that it does not. (*Ibid.*) In furtherance of this burden, the appellant must fairly summarize all the facts in the light most favorable to the judgment. (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290.) This burden to provide a fair summary of the evidence "grows with the complexity of the record." (*Ibid.*)

The record in this case is lengthy. The testimony heard by the jury spans 21 of the 46 volumes of reporter's transcripts. Plaintiffs also provided 25 trial exhibits in their appendices. In contrast, defendant did not submit a single trial exhibit, though it frequently cites these exhibits in its briefing, including some that are not in our record. Defendant provided only a brief summary of the evidence and summarized only those facts that support its theories. While we could deem defendant's failure to provide an adequate record and set out the facts in the light most favorable to the judgment a forfeiture (*Foreman & Clark Corp.*, *supra*, 3 Cal.3d at p. 881), we have elected not to do so. Our independent review of the record reveals the jury's verdict on concealment should be upheld, as we discuss in the next sections.

a.    Duty to Disclose and Causation

Defendant argues that there is no evidence establishing that it had a duty to disclose because there was no evidence of a transaction between itself and Burch; defendant also argues that there was no evidence of but-for causation as opposed to *Rutherford* causation, which allows a plaintiff in a product liability asbestos case to prove causation by establishing a reasonable medical probability that exposure to a defendant's

product contributed to the plaintiff's risk of developing cancer. (See *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 957–958.)

With respect to concealment, " '[t]here are "four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." ' " (*Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 311.) The latter three circumstances " 'presuppose[] the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise.' " (*Ibid.*) This relationship has been described as a "transaction," such as that between " ' "seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual arrangement." ' " (*Shin v. Kong* (2000) 80 Cal.App.4th 498, 509.)

However, the jury was not instructed that it was required to find a transaction sufficient to support a duty to disclose; it was instead instructed under CACI jury instruction 1901 that plaintiffs must prove: "One, that CertainTeed actively concealed an important fact or prevented plaintiff from discovering the fact. Two, that plaintiff did not know of the concealed fact. [¶] Three, that CertainTeed intended to deceive plaintiff by concealing the fact. Four that had the omitted information been disclosed, plaintiff reasonably would have behaved differently. Five, that plaintiff was harmed, and six, that CertainTeed's concealment was a substantial factor in causing plaintiff's harm." Similarly, the jury was instructed only on *Rutherford* causation.[5]

---

[5] The *Rutherford* causation instruction under CACI 435 was as follows: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It does not have to be the only cause of the harm. Plaintiff may prove that exposure to asbestos from each defendant's product was a substantial factor causing his illness by showing, through expert testimony, that there is a reasonable medical probability that the exposure contributed to the plaintiff's risk of developing

9

On the record before us, defendant is prohibited from seeking reversal of the jury's verdict based on theories different from those it advanced and tried below. When a party by its conduct induces the commission of error, it may not claim that the judgment should be reversed because of that error. (*Jentick v. Pacific Gas & Elec. Co.* (1941) 18 Cal.2d 117, 121 (*Jentick*).) *Jentick* is instructive. In *Jentick*, the defendant appealed from a judgment following a jury verdict after the court's denial of its motions for a directed verdict, judgment notwithstanding the verdict, and a new trial. (*Id.* at p. 120.) The jury returned a verdict finding the defendant vicariously liable for the acts of two of its employees, while at the same time finding the employees were not liable. The Supreme Court found that the defendant could not challenge the verdict because it had invited the jury's error by requesting an erroneous jury instruction that led the jury to believe that it could hold defendant vicariously liable for plaintiffs' damages, and at the same time exonerate the two employees. (*Id.* at p. 121.) The Supreme Court thus affirmed the judgment. (*Id.* at p. 122; see also *Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 567 [a party may not urge reversal of a judgment based on jury instructions jointly requested].)

Here, prior to the jury instruction conference, defense counsel told the court that the parties had agreed on the language of the CACI jury instructions to be submitted. The record reflects that the parties jointly requested the CACI jury instructions given on concealment and *Rutherford* causation, and the parties agreed that the traditional but-for causation instruction should not be given. Although defendant objected at the jury instruction conference to giving the concealment instruction, it did so only because it argued that plaintiffs failed to introduce evidence establishing that material facts were concealed, not because the instruction failed to instruct the jury on the requisite duty to disclose. As the Supreme Court found in *Jentick*, where a defendant's actions are

---

cancer." Defendant concedes that the evidence supports a finding of *Rutherford* causation.

10

responsible for the erroneous instructions and verdict, the defendant must accept them.[6] (*Jentick*, *supra*, 18 Cal.2d at p. 122.)

The principles underlying the theory of trial doctrine also support our conclusion. Where the parties try the case on certain theories or on assumptions that certain issues are raised by the pleadings, or that a particular issue is controlling, neither can change this theory for purposes of review on appeal. (*Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC* (2012) 205 Cal.App.4th 999, 1026 [rejecting a new defense theory on appeal]; see also *Durkee v. Chino Land and Water Co.* (1907) 151 Cal. 561, 569 [defendant could not argue for the first time on a new trial motion that plaintiff used an incorrect rule to measure damages where the defendant cross-examined the plaintiff's damages witnesses, failed to object to the evidence, and failed to insist on the proper rule of damages at trial]; *Jones v. Dutra Construction Co.* (1997) 57 Cal.App.4th 871, 876–878 [plaintiff could not raise failure to plead an affirmative defense on appeal where he responded to defendant's motion for summary judgment on the merits without raising the issue, and, had he raised it, defendant could have sought to amend its answer]; *Simmons v. Ware* (2013) 213 Cal.App.4th 1035, 1050–1051 [reversing grant of JNOV, in part because the plaintiff had not pled or presented to the jury the issue on which the court granted JNOV].)

In this case, defendant moved for summary judgment and for nonsuit, but it did not raise the issues of a duty to disclose or but-for causation. With respect to the existence of a transaction sufficient to support a duty to disclose, the record shows that while this case was pending, defendant moved for summary judgment on this issue in a separate asbestos personal injury case pending in another court, suggesting that defendant was clearly aware of the issue. And this was not a case where defendant consistently maintained that it never sought contact with the plaintiff. Instead, defendant tried its case on the theory that it did everything it could to provide information about its A/C pipe to

---

[6] Code of Civil Procedure section 647, which deems the giving an instruction to be excepted to, does not negate the doctrine of invited error where a party requests a jury instruction. (*Ventura v. ABM Industries Inc.* (2013) 212 Cal.App.4th 258, 271.)

11

its customers and to Burch. And, as previously noted, the jointly requested jury instructions do not submit the issues of a duty to disclose or but-for causation to the jury. On this record, defendant's change in theory after trial and its contention that the jury verdict is unsupported by evidence establishing a duty to disclose or but-for causation provide no basis for reversal.[7] (*Jentick*, *supra*, 18 Cal.2d at pp. 121–122; *Durkee*, *supra*, 151 Cal. at p. 569.)

> b. Active Concealment, Intent to Deceive, and Reliance

Next, substantial evidence supports the jury's findings on active concealment, intent to deceive, and reliance. In the 1960's, defendant learned of the correlation between cancer and asbestos. Defendant's internal memoranda from the 60's recount reports in the industry of mesothelioma in people having no occupational exposure to asbestos; industry suspicion that even small concentrations of asbestos fiber have an effect if lodged in the body for long periods; reports of increased evidence that workers with low exposure to asbestos are subject to mesothelioma; a report of a correlation between mesothelioma and crocidolite asbestos; and recommended respiratory, dust control, and annual x-ray programs for defendant's plant workers due to the dangers of asbestos dust. Defendant's corporate safety director from the 60's further testified that there was never any discussion about safe levels of asbestos exposure in correlation to cancer because the only safe level of exposure to a product that may cause cancer was zero.

In 1972, despite this information, defendant rallied the Occupational Safety and Health Administration (OSHA) to raise the suggested asbestos exposure limit to one that defendant would "try to live with," while still "preserving [its] business." Defendant lobbied to keep the word "cancer" from any legally required warning signs and to prevent product warning labels on A/C pipe, stating that such warnings would make its product

---

[7] In denying defendant's motion for JNOV, the court below relied on *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, and *Bullock v. Phillip Morris USA, Inc.* (2008) 159 Cal.App.4th 655. We do not rely on these cases, although they are consistent with the result we reach.

12

unsellable and there was no need for them because the pipe was "seldom if ever cut or machined" after leaving the plant.  Yet, defendant's installation guides from the 1960's and early 1970's touted the ease of cutting and machining A/C pipe in the field.

In 1977, because the question of health continued "to plague" defendant, it developed a script for its salespeople to discuss "A/C Pipe and Health."  Salespeople were told that certain information should be given to customers "only when the A/C Pipe and Health question has been raised by an existing or potential customer."  They were also told not to ad lib, and to quote the script when speaking to customers.

Defendant did not give customers pamphlets regarding the safe handling of or the health implications of its A/C pipe until 1977, when it created scripts and brochures acknowledging that asbestos fibers may be a "possible health hazard," but stating that its A/C pipe was "non-harmful" as the fibers were "locked-in."  Yet Burch testified the A/C pipe was dusty to work with and even to touch, and it could be inferred from the evidence that defendant knew its A/C pipe was machined and released dust in the field.  Defendant did not use the word "cancer" on warning labels until 1985.  This record provides substantial evidence supporting the jury's finding of both actionable concealment and intent to deceive.

With respect to reliance, defendant argues no evidence exists because Burch was not asked whether he would have behaved differently had he known the truth and he testified he did not see defendant's brochures or installation guides.  This may be true, but defendant ignores testimony from Burch and his co-workers stating the A/C pipe they worked with did not warn of cancer, and they believed the product was safe.  Burch testified, "I thought it was all safe to work," and he said he expected that if a product was carcinogenic, the manufacturer would warn those who worked with the product.  Burch also testified that he fears dying young from cancer and worries about how his family will live.  From this testimony, the jury could reasonably infer that, had Burch known of the concealed danger of cancer, he would have behaved differently.  (See *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 170 [reliance may be established through

13

circumstantial evidence showing the alleged fraudulent misrepresentation or concealment substantially influenced the party's choice].)

        2.     Substantial Evidence Does Not Support the Jury's Verdict for Intentional Misrepresentation

Plaintiffs contend the court erroneously granted JNOV on their intentional misrepresentation claim because they introduced substantial evidence of each of the following elements of fraud: (1) false representation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974.)

The problem with plaintiffs' argument, as the trial court recognized, is that the record is devoid of evidence showing reliance. "It is settled that a plaintiff, to state a cause of action for deceit based on a misrepresentation, must [prove] that he or she actually relied on the misrepresentation." (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1089.) Burch testified that he does not recall ever seeing the materials containing defendant's misrepresentations, and Burch cannot have relied on what he never saw. (*Id.* at p. 1095 [finding reliance could not be pled where plaintiffs could not allege the misrepresentations ever came to their attention].)

Plaintiffs' efforts to conjure substantial evidence of reliance are unavailing. They point to: (1) testimony stating that defendant intended to reach all A/C pipe contractors in California with information regarding how to use its A/C pipe; (2) counsel's argument that the misrepresentations must have reached Burch; and (3) section 533 of the Restatement (Second) of Torts (Restatement (Second) section 533). But testimony that defendant intended for information to be passed on to contractors does not provide substantial evidence that Burch, an employee of a contractor, in fact received and relied on this information. And counsel's argument is not evidence. (*Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1173.)

Plaintiffs also mistake the import of the Restatement (Second) section 533, which provides an exception to the traditional rule requiring that a defendant make a misrepresentation directly to the plaintiff. (*Mirkin*, *supra*, 5 Cal.4th at p. 1095.) Under

14

the Restatement (Second) section 533, a plaintiff can sue the maker of a misrepresentation where the misrepresentation was made to a third party and the maker intends or has reason to expect that the misrepresentation will be repeated or communicated by the third party to the plaintiff. (*Ibid.*) Neither the Restatement (Second) section 533, nor the authorities endorsing it, eliminate a plaintiff's burden to show reliance. "[A] plaintiff who hears an alleged misrepresentation indirectly must still show 'justifiable reliance upon it . . . .' " (*Id.* at p. 1096.)

Finally, this case is distinguishable from *Engalla*, *supra*, 15 Cal.4th 951, and *Boeken v. Philip Morris*, *Inc.* (2005) 127 Cal.App.4th 1640 (*Boeken*), cited by plaintiffs for the proposition that reliance can be inferred from circumstances. In *Engalla*, a decedent's family sought to avoid arbitration of their malpractice claims by showing that the arbitration agreement decedent signed contained fraudulent misrepresentations about the expeditiousness of arbitration. Decedent's employer selected the medical plan with the arbitration agreement, but the Supreme Court found an employer that negotiates group medical benefits for its employees acts as the employees' agent during negotiation, and evidence of a material misrepresentation made to the agent creates a rebuttable presumption of reliance. (*Engalla*, *supra*, 15 Cal.4th at pp. 977–978.) Evidence existed showing the employer considered arbitration expeditious and that it would have looked unfavorably at the hospital's arbitration system, so the Supreme Court directed the trial court to resolve the factual issues underlying fraudulent inducement on remand. (*Id.* at pp. 979–981.)

In *Boeken*, a plaintiff who started smoking Marlboros as a minor sued the manufacturer for fraud and other torts. (*Boeken*, *supra*, 127 Cal.App.4th at p. 1650.) On appeal from an unfavorable jury verdict, the defendant argued that the plaintiff had to admit evidence of the exact words of the misrepresentations upon which the plaintiff relied to prove reliance. (*Id.* at p. 1660.) The court disagreed: the record showed a vast Marlboros marketing campaign targeted at boys from 10 to 18 which portrayed young, virile men smoking; the plaintiff bought Marlboros because they were advertised everywhere; and all of plaintiff's social group smoked Marlboros. Plaintiff testified that

15

he was inundated with and impressed by Marlboro ads, and he perceived that it was the only cigarette to smoke. (*Id.* at p. 1662.) He also picked out several advertisements that looked familiar to him, and he recalled various themed ad campaigns. (*Ibid.*) The court concluded there was substantial evidence to support a finding that plaintiff relied on defendant's advertising, despite his inability to recall the advertisements word-for-word. (*Id.* at p. 1667.)

Unlike in *Boeken*, the record here contains no evidence that Burch saw anything from defendant's installation guides and brochures, which defendant testified would have been sent to Burch's employer. Nor is this a case like *Engalla* where evidence of employer reliance existed, and the employer acted as an agent for his employees in selecting a group medical plan. The court correctly granted JNOV on plaintiffs' intentional misrepresentation claim.

C.     *Defendant's Jury Instruction Challenge*

Defendant challenges the court's refusal to give its special jury instruction no. 2. With respect to this instruction, defendant's theory was that starting in 1977, it provided Burch's employers with information regarding the proper handling of its A/C pipe, including not to cut the pipe with an abrasive disc saw because that led to unsafe exposure levels under regulations of OSHA and the Division of Occupational Safety and Health of California (Cal-OSHA), and the employers did not pass this information on or use reasonable methods to protect their employees from asbestos exposure. Defendant's special jury instruction no. 2 provided: "An employer has the duty to furnish a place of employment that is safe and healthful to its employees. An employer has a duty to furnish and use safety devices, safeguards, practices, methods and processes that are reasonably adequate to render the workplace safe. An employer has a duty to do everything reasonably necessary to protect the life, safety, and health of its employees."[8]

---

[8] As originally written, this instruction ended: "The duty of the employer to provide a safe workplace cannot be delegated to other individuals or companies," but defendant withdrew this last sentence.

16

The court refused to give this instruction under *Elsner v. Uveges* (2004) 34 Cal.4th 915 (*Elsner*), but invited defendant to submit an alternative instruction. Defendant said that it would do so but did not. Defendant now argues that its initial instruction was an accurate statement of the law, and the court's refusal to give the instruction was prejudicial.[9]

1. The Court Correctly Refused Special Jury Instruction No. 2

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him [or her] which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) A court may refuse a proposed instruction that incorrectly states the law or is argumentative, misleading, or incomplete. (*Shaw v. Pacific Greyhound Lines* (1958) 50 Cal.2d 153, 158; *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475.) The legal propriety of jury instructions is reviewed de novo. (*Davis v. Honeywell Internat. Inc.* (2016) 245 Cal.App.4th 477, 495.)

Defendant's special jury instruction no. 2 derives from Labor Code sections 6400 and 6401, which are part of Cal-OSHA laws.[10] From 1972 through 1999, Labor Code former section 6304.5 barred the use of Cal-OSHA provisions to establish a duty or standard of care in personal injury and wrongful death actions other than those between

---

[9] Defendant's failure to propose an alternative instruction waives any argument that a modified instruction should have been given. (See *Hilts v. County of Solano* (1968) 265 Cal.App.2d 161, 171.)

[10] Labor Code section 6400, subdivision (a) states: "[e]very employer shall furnish employment and a place of employment that is safe and healthful for the employees therein." Labor Code section 6401 states, "Every employer shall furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful. Every employer shall do every other thing reasonably necessary to protect the life, safety, and health of employees."

an employee and employer.  (*Elsner*, *supra*, 34 Cal.4th at p. 923.)[11]  In 1999, the Legislature substantially amended Labor Code section 6304.5, and it now permits the introduction of Cal-OSHA provisions to establish a duty or standard of care to the same extent as other regulations or statutes.  (*Id.* at pp. 938–939.)

In *Elsner*, the Supreme Court addressed whether the amended version of Labor Code section 6304.5 could be applied to conduct that occurred prior to its effective date. There, a subcontractor's employee sued a general contractor for injuries caused by the collapse of the general contractor's scaffolding; Cal-OSHA provisions were introduced at trial to establish a duty of care and a standard of care, and to shift the burden of proof through negligence per se.  (*Elsner*, *supra*, 34 Cal.4th at pp. 924, 937.)  The Supreme Court explained that the test for whether amended Labor Code section 6304.5 can be applied to conduct that occurred prior to its effective date is whether its application changes the legal consequences of past conduct by imposing new or different liabilities; if so, absent an express legislative intent to permit retroactive application, it is forbidden. (*Id.* at p. 937.)  The court noted that admission of statutes imposing broader duties on a defendant than existed under the common law imposes new or different liabilities on a defendant because it attaches tort liability to the violation of statutes and regulations that previously gave rise only to civil and criminal penalties.  (*Ibid.*, citing Lab. Code, §§ 6317, 6423, 6425, 6427–6430.)  However, the Supreme Court found that admission of Cal-OSHA provisions requiring an employer to provide a safe workplace did not expand the defendant's duty of care where the plaintiff's sole theory was that the defendant provided unsafe scaffolding, and defendant had a common law duty to provide safe

---

[11] Labor Code former section 6304.5 then provided:  "It is the intent of the Legislature that the provisions of this division shall only be applicable to proceedings against employers brought pursuant to the provisions of Chapter 3 (commencing with Section 6500) and 4 (commencing with Section 6600) of Part 1 of this division for the exclusive purpose of maintaining and enforcing employee safety.  [¶]  Neither this division nor any part of this division shall have any application to, nor be considered in, nor be admissible into, evidence in any personal injury or wrongful death action arising after the operative date of this section, except as between an employee and his own employer."  (Lab. Code, former § 6304.5, added by Stats. 1971, ch. 1751, § 3.)

equipment. (*Id.* at p. 937, citing *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219, 225.)

The Supreme Court reached a different result with respect to the use of Cal-OSHA provisions to establish a standard of care and to shift the burden of proof. (*Elsner*, *supra*, 34 Cal.4th at pp. 938–939.) The use of Cal-OSHA provisions to set a standard of care by which to measure the defendant's conduct made the defendant potentially liable for actions that may have satisfied the common law standard of care, but not the specific Cal-OSHA provisions. (*Id.* at p. 938.) Thus, the Supreme Court held that the Labor Code provisions could not be used to establish a standard of care. (*Id.* at pp. 938–939.)

Under *Elsner*, the question then is whether special jury instruction no. 2 sought to impose broader liabilities, or duties or standards of care, on employers than those applicable at common law. (*Elsner*, *supra*, 34 Cal.4th at pp. 937–938.) An employer had a common law duty to use reasonable care to furnish its employees with a safe workplace and equipment. (See, e.g., *Bailey v. Central Vermont Ry., Inc.* (1943) 319 U.S. 350, 352; *Alber v. Owens* (1967) 66 Cal.2d 790, 792; *Thompson v. Atchison, T.&S.F. Ry. Co.* (1950) 96 Cal.App.2d 974, 977.) Special jury instruction no. 2 imposes a duty on an employer to furnish a safe and healthful place of employment, to use safety devices, safeguards, and safe practices, methods, and processes, and to do everything reasonably necessary to protect the life, safety, and health of employees. The record shows that defendant sought to use this instruction to convince the jury that Burch's employers were required to follow Cal-OSHA provisions, and the employers violated these provisions by allowing employees to cut A/C pipe with abrasive disc saws and by failing to monitor asbestos exposure. Defendant was effectively trying to use the jury instruction to hold Burch's employers liable for violating a more specific standard of care created by Cal-OSHA with respect to asbestos permissible exposure limits, which is precisely what *Elsner* prohibits. (*Elsner*, *supra*, 34 Cal.4th at pp. 938–939.) Thus, defendant

19

impermissibly sought to broaden the employers' duties and standards of care through use of Cal-OSHA provisions, and the court properly declined to give this instruction.[12]

### 2. Defendant Does Not Establish Prejudicial Instructional Error

Even if special jury instruction no. 2 did not impermissibly broaden the employers' liability in violation of *Elsner*, reversal is not required because defendant has not shown prejudicial error. (*Soule*, *supra*, 8 Cal.4th at p. 580 [only prejudicial instructional error is reversible].) Defendant's theory of prejudice is that, had the court given defendant's instruction, the jury would have concluded Burch's employers violated Cal-OSHA by failing to prevent use of the abrasive disc saw to cut A/C pipe, and the jury would have allocated more fault to the employers. "[W]hen deciding whether an error of instructional omission was prejudicial, the court must . . . evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580–581.)

At the outset, we note that defendant's theory that Burch's employers bore a large proportion of fault for failing to protect Burch from asbestos exposure was an obvious aspect of its case. Defendant presented its theory in opening argument. On cross-examination, defendant elicited testimony from plaintiffs' industrial hygienist that Burch's employers had to comply with OSHA and Cal-OSHA, and under these laws, the employers were responsible for workplace safety and were required to protect employees from asbestos dust exposure and other hazards. Defense counsel cross-examined witnesses on the employers' safety procedures and their failure to require the use of masks and to prevent hazardous A/C pipe cutting practices; counsel also elicited testimony from Burch and his co-workers stating that they expected their employers to pass on any relevant safety information or warnings.

Defense counsel devoted significant time in closing argument to the theory that Burch's employers failed to provide a safe workplace, and counsel articulated that theory

---

[12] Although the court in *Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022 gave a similar jury instruction as that sought by defendant, *Evans* is inapposite because it did not address *Elsner*.

very clearly. Although the court sustained an objection when counsel began arguing that experts had opined that OSHA applied to Burch's employers, counsel moved on and argued without obstruction that Burch's employers had a wealth of knowledge about the proper procedures for handling A/C pipe, they did not follow these, and they were legally responsible for ensuring a hazard-free workplace. Counsel also asked the jury directly who was responsible for Burch's harm, defendant, who sent out information about the right work practices, or "his employer who apparently let him use the wrong work practices?" Further, counsel urged the jury to allocate 100 percent fault to the employers.

Nor did the omission of special jury instruction no. 2 leave defendant with an absence of instructional support for its defense of employer fault. The jury was instructed, "[defendant] claims the fault of the other entities also contributed to plaintiff's harm[;]" to succeed on this theory, the court told the jury that defendant had to prove that other entities were negligent or otherwise at fault, and that this fault was a substantial factor in causing plaintiffs' harm. The court instructed the jury on the definition of negligence. The court also instructed the jury to assign a portion of responsibility to each entity that it found to be a substantial factor in causing plaintiffs' harm. The instructions given conveyed defendant's theory and did not foreclose a jury finding on this theory.

Finally, although the jury asked questions during deliberation, it did not ask any regarding the duties of Burch's employers or the fault of others. The unanimous jury verdict apportioned 62 percent fault to defendant, 27 percent fault to other A/C pipe manufacturers, and 11 percent fault to Burch's employers. The jury thus gave no indication that it was confused on the fault apportionment, or that its deliberations were affected accordingly. Even if the court erred in failing to give special jury instruction no. 2, defendant has not shown a reasonable probability that the error prejudicially affected the jury's verdict.

D.      *Section 1431.2*

Under section 1431.2, subdivision (a), plaintiffs argue that the court was not allowed to apportion liability for noneconomic damages according to fault for an intentional tortfeasor. The courts are split on the question of whether section 1431.2

21

requires a judgment of several liability for an intentional tortfeasor for noneconomic damages in direct proportion to the intentional tortfeasor's percentage of fault. (Compare *Thomas v. Duggins* (2006) 139 Cal.App.4th 1105 (*Thomas*) [section 1431.2 does not apply to an intentional tortfeasor's liability for noneconomic damages] with *B.B. v. County of Los Angeles* (2018) 25 Cal.App.5th 115 [section 1431.2 mandates several liability for noneconomic damages in direct proportion to a defendant's percentage of fault even where the defendant's misconduct was intentional], review granted Oct. 10, 2018, S250734 (*B.B.*).) Our Supreme Court granted review of *B.B.*, and will soon resolve this split of authority. In the meantime, we agree with *Thomas* and hold that section 1431.2 does not operate to limit an intentional tortfeasor's liability for noneconomic damages to its percentage of fault under comparative fault principles.

In 1986, the voters approved Proposition 51, a compromise measure that sought to balance the interests of injured parties who have sustained considerable damages caused by several tortfeasors, one or more of which is insolvent, against unfairness of the rule of joint and several liability, which could result in a minimally culpable tortfeasor being held liable for all the plaintiff's damages. (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1198.) Section 1431.2 provides in relevant part: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for noneconomic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."

In *Thomas*, the Court of Appeal for the Fourth Appellate District held that section 1431.2 does not allow apportionment of several noneconomic damages for an intentional tortfeasor according to the intentional tortfeasor's proportion of fault. (*Thomas*, *supra*, 139 Cal.App.4th at p. 1108.) The court reasoned that, at the time Proposition 51 passed, an intentional tortfeasor was not entitled to a reduction of the judgment due to the plaintiff's negligence or that of third parties,

22

and policy considerations of deference and punishment for intentional torts supported the conclusion that an intentional tortfeasor's liability was not subject to apportionment where the negligence of one or more third party tortfeasors contributed to a plaintiff's injuries. (*Id.* at p. 1112.)

In *B.B.*, the Court of Appeal for the Second Appellate District disagreed with *Thomas*, holding that section 1431.2 requires several liability for noneconomic damages in proportion to fault, regardless of whether the defendants act intentionally or negligently. (*B.B.*, *supra*, 25 Cal.App.5th at p. 127, review granted.) To support its holding, the court relied mainly on the Supreme Court's decision in *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593 (*DaFonte*).

In *Da Fonte*, the Supreme Court addressed whether section 1431.2 eliminated a negligent defendant's joint and several liability to an injured employee for noneconomic damages attributable to the negligence of an employer who was statutorily immune from suit. There, an employee sued the manufacturer of a product that injured the employee at work, and the manufacturer sought to demonstrate the employer's negligent safety policies were partly responsible. Relying on workers' compensation law that prevented the employee from suing the employer for tort damages, the employee argued noneconomic damages should not be apportioned for the defendant because section 1431.2 eliminated joint liability for noneconomic damages only among defendants whose liability was joint and several before the statute was enacted. (*DaFonte*, *supra*, 2 Cal.4th at pp. 600–601.)

The Supreme Court rejected the plaintiff's argument that preexisting law compelled an exception to section 1431.2's unambiguous directive. The court explained: "Section 1431.2 declares plainly and clearly that in tort suits for personal harm or property damage, no 'defendant' shall have 'joint' liability for 'non-economic' damages, *and* '[e]ach defendant' shall be liable 'only' for those 'non-economic' damages directly attributable to his or her own 'percentage of fault.' The statute neither states nor implies an exception for damages attributable

23

to the fault of persons who are immune from liability or have no mutual joint obligation to pay missing shares.  On the contrary, section 1431.2 expressly affords relief to every tortfeasor who *is* a liable 'defendant,' and who formerly *would* have had full joint liability." (*DaFonte*, *supra*, 2 Cal.4th at p. 601.)  Thus, the Court held that the defendant's liability for noneconomic damages must be several, apportioned according to his percentage of comparative fault.  (*Id.* at p. 604.)

Based on this, the court in *B.B.* also held that section 1431.2 was unambiguous and applied to any defendant in an action for personal injury, property damage, or wrongful death, and it criticized *Thomas's* resort to extrinsic aids to interpret the statute.  (*B.B.*, *supra*, 25 Cal.App.5th at pp. 124–128, review granted.)  "Consistent with *DaFonte*, we conclude the unambiguous reference to "[e]ach defendant" in section 1431.2, subdivision (a) mandates allocation of noneconomic damages in direct proportion to a defendant's percentage of fault, regardless of whether the defendant's misconduct is found to be intentional." (*Id.* at p. 128.)

We agree with *B.B.* that section 1432.1, like all statutes, must be interpreted according to its language. (*DaFonte*, *supra*, 2 Cal.4th at p. 601.)  However, *B.B.* failed to credit the entire statutory text.  Again, section 1432.1 expressly states, "[i]n any action for personal injury, property damage, or wrongful death, *based upon principles of comparative fault*, the liability of each defendant for noneconomic damages shall be several only and shall not be joint." (Civ. Code, § 1431.2, subd. (a), italics added.)  *B.B.* appears to have read the language "based upon principles of comparative fault," out of the statute.  To understand the import of this language, it is useful to place Proposition 51's modification of common law joint and several liability in brief historical perspective.

In *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, the Supreme Court first introduced comparative negligence and eliminated the all-or-nothing doctrine of contributory negligence.  Thereafter, California followed a system of pure

comparative negligence, "the fundamental purpose of which shall be to assign responsibility and liability for damage in direct proportion to the amount of negligence of each of the parties." (*Id.* at p. 829.)

In *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 582–583 (*American Motorcycle*), the Supreme Court held that comparative fault principles did not abrogate each defendant's joint and several liability for damages attributable to the fault of others. But *American Motorcycle* took steps to ameliorate the harshness of this rule by concluding that a defendant sued for personal injury could join other concurrent negligent tortfeasors to allocate proportionate responsibility and could seek equitable indemnity from such tortfeasors in proportion to their fault. (*Id.* at pp. 583–584.)

When Proposition 51 was enacted, the comparative fault principles announced in *Li* and *American Motorcycle* did not allow intentional tortfeasors to reduce their liability on the account of a negligent joint tortfeasor's fault. In *Allen v. Sundean* (1982) 137 Cal.App.3d 216, 227, the court held that comparative fault principles did not extend to allow an intentional tortfeasor to recover equitable indemnity against a negligent tortfeasor. In *Godfrey v. Steinpress* (1982) 128 Cal.App.3d 154, 176, the court held that a plaintiff's contributory negligence is not a defense to an intentional tort, and it ruled the trial court correctly refused to instruct on comparative negligence with respect to the plaintiff's intentional tort claims. In addition, an intentional tortfeasor could not seek statutory contribution from other liable tortfeasors. (Code Civ. Proc., § 875, subd. (d).) Thus, unlike a negligent tortfeasor, an intentional tortfeasor was jointly and severally liable for all the plaintiff's damages and had no mechanism to reduce this liability. In using the language "based on principles of comparative fault," section 1431.2 must be read to have incorporated these judicially construed principles. (*In re Harris* (1989) 49 Cal.3d 131, 136; *Wilson v. John Crane, Inc.* (2000) 81 Cal.App.4th 847, 855 [interpreting "comparative fault principles" as they were judicially construed in 1986 to apply to strict product liability cases].)

25

To the extent ambiguity exists, Proposition 51's ballot materials also aid our construction. (See *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245–246 [ballot materials may help resolve ambiguities in initiative measures].) The official ballot description of Proposition 51 provided that, "[u]nder existing law, tort damages awarded a plaintiff in court against multiple defendants may all be collected from one defendant," and, "[a] defendant paying all the damages may seek equitable reimbursement from other defendants." (Ballot Pamp., Primary Elec. (June 3, 1986), Prop. 51, Official Title and Summary Prepared by the Atty. Gen., p. 32.) The ballot materials explain that "this rule" is maintained under the initiative for economic damages, but would be modified for noneconomic damages. (*Ibid.*) The rule discussed—that allowing a defendant to seek equitable reimbursement after paying a plaintiffs' damages—never applied to intentional tortfeasors. Thus, the ballot measures indicate that intentional tortfeasors were not intended to fall within Proposition 51's modified scope.

Our interpretation also fulfills our obligation to effectuate Proposition 51's purpose. (See *Santa Barbara County Taxpayers Assn. v. County of Santa Barbara* (1987) 194 Cal.App.3d 674, 681.) The inequities that Proposition 51 targeted were "situations in which defendants who bore only a small share of fault for an accident could be left with the obligation to pay all or a large share of the plaintiff's damages if other more culpable tortfeasors were insolvent." (*Evangelatos*, *supra*, 44 Cal.3d at p. 1198.) Again, this was never the case with an intentional tortfeasor who, deemed to be the most culpable of all, could not seek contribution or equitable indemnity from less culpable tortfeasors regardless of their solvency. (Code Civ. Proc., § 875, subd. (d); *Allen*, *supra*, 137 Cal.App.3d at p. 227.) Section 1431.2's purpose is simply not fulfilled by applying it in the manner defendant or amici curiae seek.

Nor do we agree with *B.B.*'s view that *DaFonte* compels a different conclusion. The Supreme Court in *DaFonte* addressed only the question of

whether section 1431.2 eliminated a negligent defendant's joint and several liability for noneconomic damages attributed to the negligence of a joint tortfeasor who was statutorily immune from suit. (*DaFonte, supra*, 2 Cal.4th at p. 596.) The Supreme Court had no occasion to consider the question of whether section 1431.2 eliminates an intentional tortfeasor's joint and several liability for noneconomic damages in tort actions.

Finally, *Weidenfeller v. Star & Garter* (1991) 1 Cal.App.4th 1 (*Weidenfeller*), relied on by defendant and amici curiae, does not hold that section 1431.2 applies to reduce the liability of an intentional tortfeasor. In *Weidenfeller*, the plaintiff was assaulted outside of a bar that defendants owned, and the jury found the plaintiff 5 percent negligent, the bar's owners 20 percent negligent, and the absent assailant to be 75 percent at fault. The trial court allocated 20 percent of plaintiff's noneconomic damages to the negligent defendants, and plaintiff argued on appeal that section 1431.2 did not allow apportionment of noneconomic damages according to fault because comparative fault principles do not apply where one tortfeasor acted intentionally. (*Id.* at p. 5.)

The court disagreed, finding that section 1431.2 cannot be read to allow a plaintiff to use an intentional tortfeasor's participation to escalate the liability of negligent tortfeasors above their allocated fault. (*Weidenfeller*, *supra*, 1 Cal.App.4th at pp. 6–7.) In so holding, the court reviewed *Allen*, *supra*, 137 Cal.App.3d 216, and *Godfrey*, *supra*, 128 Cal.App.3d 154, and stated, "[t]hese cases reflect the common law determination that a party who commits intentional misconduct should not be entitled to escape responsibility for damages based upon the negligence of the victim or a joint tortfeasor." (*Weidenfeller*, *supra*, 1 Cal.App.4th at p. 7.) *Weidenfeller* supports our conclusion that an intentional tortfeasor may not rely on section 1431.2 to reduce its liability for a plaintiff's noneconomic damages. For the foregoing reasons, we conclude that the trial court erred in apportioning plaintiffs' noneconomic damages according to defendant's allocated proportion of fault under section 1431.2.

27

E.      *Partial Satisfaction of the Judgment (Appeal No. A153624)*

After the parties filed appeals and cross-appeals from the judgment and amended judgment, defendant sent plaintiffs a check for $3.5 million, intending to partially satisfy the judgment.  In the cover letter accompanying the check, defendant stated that it sent the money for the purposes of preventing enforcement of the judgment and to stop postjudgment interest from running.  Defendant did not waive any right to appeal the judgment and concluded:  "[Defendant] expects and anticipates that Plaintiffs will immediately return the amount tendered herein should the Court of Appeal reverse or vacate the judgment, including any potential remand for a full or partial retrial or should the California Supreme Court reverse or vacate the judgment, including any potential remand for a full or partial retrial, following any conclusion of proceedings in the Court of Appeal.  Accordingly, we believe it is appropriate that plaintiffs take steps to ensure that they will be able to repay the funds to [defendant] should [defendant] prevail on appeal, including by, for example, placing them in a separate account or in escrow."

Plaintiffs did not accept or deposit the check, and they did not execute the partial satisfaction of judgment.  Defendant filed a supersedeas bond for the statutorily required amount minus $3.5 million, and plaintiffs filed an objection to the sufficiency of the bond.  Defendant, in turn, filed a motion to compel plaintiffs to execute an acknowledgment of partial satisfaction of the judgment.  The court denied defendant's motion to compel and sustained plaintiffs' objection to the sufficiency of the bond.  The court reasoned that defendant's attempted payment of part of the judgment, subject to its right to appeal and the express right to repayment upon reversal, did not as a matter of law constitute a partial "satisfaction" of the judgment that stops the running of postjudgment interest.

1.      Governing Legal Standards

Under Code of Civil Procedure section 724.110, subdivision (a), a judgment debtor may serve on a judgment creditor a written demand that the judgment creditor execute, acknowledge, and deliver an acknowledgment of partial satisfaction of judgment.  If the judgment creditor does not comply within 15 days of service of the

28

demand, the judgment debtor may bring a noticed motion for an order requiring the judgment creditor to comply. (Code Civ. Proc., § 724.110, subd. (b).) If the court determines that the judgment has been partially satisfied and that the judgment creditor has not complied with the demand, the court shall make an order determining the amount of the partial satisfaction and may make an order requiring the judgment creditor to comply with the demand. (*Ibid.*) On appeal, the interpretation of a statute is a question of law, which we review de novo, but we uphold the factual findings supporting the trial court's decision on a motion for satisfaction of judgment if the findings are supported by substantial evidence. (*Jhaveri v. Teitelbaum* (2009) 176 Cal.App.4th 740, 748–749.)

2.      Analysis

Plaintiffs argue that satisfaction of a judgment can only occur when the judgment is paid, its validity acknowledged, and all legal challenges to the judgment are over. Defendant contends that, if satisfaction is not "voluntary" as the term has been judicially construed in *Reitano v. Yankwich* (1951) 38 Cal.2d 1 (*Reitano*), a judgment debtor may satisfy a judgment by partially or fully paying it, and, at the same time, may pursue an appeal. Both parties contend that *Reitano* supports their position. We agree with defendant as to its interpretation of *Reitano*, but we ultimately uphold the trial court's ruling that the judgment here was not partially satisfied for the reasons explained below.

*Reitano* recites the general rule that voluntary, not coerced or compulsory, satisfaction of a judgment waives the right to appeal that judgment. (*Reitano*, *supra*, 38 Cal.2d at pp. 3–4.) However, *Reitano* holds that voluntary satisfaction of a judgment does not occur unless the judgment is satisfied as a result of the parties' compromise or the satisfaction is coupled with the judgment debtor's express agreement not to appeal. (*Ibid.*) Stated otherwise, the law deems satisfaction of a judgment to be involuntary or coerced where it does not occur because of the parties' compromise or in conjunction with an agreement not to appeal. (*Ibid.*)

Plaintiffs' argument that *Reitano* holds a judgment may not be satisfied while the judgment debtor maintains an appeal relies on a single sentence: "It may be said that there has been no satisfaction under [Code of Civil Procedure] section 1049 in the sense

29

that it was intended that the litigation was to be at an end—the right of appeal waived." (*Reitano*, *supra*, 38 Cal.2d at p. 4.)[13]  With this sentence, *Reitano* did not hold that payment of a judgment while maintaining an appeal cannot ever constitute satisfaction of that judgment.  Rather, the court noted the coerced satisfaction of a judgment at issue in *Reitano* was not the type of satisfaction that terminated a case.

Plaintiffs also rely on *Brochier v. Brochier* (1946) 17 Cal.2d 822, and *Rancho Solano Master Assn v. Amos & Andrews, Inc.* (2002) 97 Cal.App.4th 681.  But as *Reitano* observed, "*Brochier v. Brochier . . .* , in saying that a satisfaction is the end of a proceeding adds nothing for it was not concerned with the right to appeal."  (*Reitano*, *supra*, 38 Cal.2d at p. 4.)  Similarly, as *Brochier* did not address satisfaction of a judgment in connection with an appeal, it adds nothing here.  In *Rancho Solano Master Assn.*, *supra*, 97 Cal.App.4th at page 688, the court held that defendant waived its right to appeal by voluntarily settling with the plaintiff and satisfying a judgment.  *Rancho Solano* thus dealt with voluntary, not coerced satisfaction, and it did not hold that "satisfaction" of a judgment can only occur when a judgment debtor pays the judgment and ends all legal challenges.  Plaintiffs provide no other authority to support their claim.

On the other hand, many cases follow *Reitano* and recount instances where a judgment has been satisfied pending the judgment debtor's appeal.  (*Retzloff v. Moulton Parkway Residents' Assn., No. One* (2017) 14 Cal.App.5th 742, 747–748 [plaintiffs' satisfaction of the judgment against them during appeal did not waive their right to appeal]; *Selby Constructors v. McCarthy* (1979) 91 Cal.App.3d 517, 520–521 [defendant's full satisfaction of judgment to prevent the running of postjudgment interest and execution on the judgment pending appeal did not waive defendant's right to appeal]; *Haddad v. Pazar* (1958) 156 Cal.App.2d 695, 698–699 [defendants who paid a judgment and obtained an order entering satisfaction of judgment to protect themselves from execution on the judgment and to avoid the running of interest did not waive appeal

---

[13] Code of Civil Procedure section 1049 provides, "[a]n action is deemed to be pending from the time of its commencement until its final determination upon appeal, or until the time for appeal has passed, unless the judgment is sooner satisfied."

rights].)  Neither party claims the attempted payment at issue resulted from compromise or was given with an express agreement not to appeal.  This case thus involves the type of coerced satisfaction addressed in *Reitano*, and we reject plaintiffs' argument that defendant could not satisfy the judgment without admitting its validity and relinquishing its right to appeal.[14]

We nonetheless uphold the trial court's ruling that the judgment here was not partially satisfied.  Before a court acts on a motion to compel execution of acknowledgment of partial satisfaction of judgment, the court must determine if the judgment has been partially satisfied.  (Code Civ. Proc., § 724.110, subd. (b).)  The mere giving of a check does not constitute payment.  (*Hale v. Bohannon* (1952) 38 Cal.2d 458, 467; *Conservatorship of McQueen* (2014) 59 Cal.4th 602, 615 [stating in dictum that the tender of payment by uncertified check does not itself constitute satisfaction of judgment under the Code of Civil Procedure].)  Further, although a judgment may be partially satisfied by tender, the tender offer must be free from any conditions that the creditor is not bound to perform.  (Code Civ. Proc., § 685.030, subd. (d); *Beeler v. American Trust Co.* (1946) 28 Cal.2d 435, 443 [tender of amount due]; Civ. Code, § 1494 [offer of performance must be free from any conditions the creditor is not bound to perform].)

Here, the parties agree that plaintiffs rejected defendant's check, and the cover letter defendant sent with the check provides substantial evidence to support the court's finding that the tender was expressly conditioned upon repayment in the event of any reversal or remand.  Contrary to defendant's assertion, Code of Civil Procedure section 908 does not transform the tender into one with conditions that plaintiffs were bound to perform.  Under this statute, on reversal of a judgment, the reviewing court may order the

---

[14] Both parties make policy arguments regarding who should receive the benefit of the difference between the 10 percent postjudgment interest rate and current lower market rates of return on safe investments.  When enacted decades ago, postjudgment interest more closely approximated the market interest rate.  (See *In re Marriage of Cordero* (2002) 95 Cal.App.4th 653, 658.)  It is for the Legislature, not the court, to address any policy concerns caused by the postjudgment interest rate.

parties to be returned to the positions they occupied before the enforcement of or execution on the judgment on terms that are just. (Code Civ. Proc., § 908.)[15] But defendant's demand included terms plaintiffs would not necessarily have been bound to perform. For example, under the terms of defendant's demand, plaintiffs would be required to repay the $3.5 million upon our reversal of the judgment, even though their new judgment will be for a larger amount than the original. Further, plaintiffs' verdict for negligence, failure to warn, and strict product liability, their economic damages, and the amount (rather than the apportionment) of their noneconomic damages were not contested on appeal. Thus, it cannot be said that plaintiffs were bound in this case to return the $3.5 million in the event of *any* reversal, remand or retrial. For these reasons, we affirm the trial court's order refusing to compel plaintiffs to execute acknowledgement of partial satisfaction of the judgment.

### III.  DISPOSITION

We affirm the trial court's order granting in part and denying in part JNOV. We reverse the March 20, 2017 judgment and remand with directions to the trial court to enter a new judgment for plaintiffs holding defendant jointly and severally liable for all of plaintiffs' economic and noneconomic damages. In the unpublished portions of this opinion, we find no error regarding defendant's special jury instruction, and affirm the trial court's order denying defendant's motion to compel plaintiffs to execute acknowledgment of partial satisfaction of judgment. The parties shall bear their own costs on appeal.

---

[15] Code of Civil Procedure section 908 provides in full: "When the judgment or order is reversed or modified, the reviewing court may direct that the parties be returned so far as possible to the positions they occupied before the enforcement of or execution on the judgment or order. In doing so, the reviewing court may order restitution on reasonable terms and conditions of all property and rights lost by the erroneous judgment or order, so far as such restitution is consistent with rights of third parties and may direct the entry of a money judgment sufficient to compensate for property or rights not restored. The reviewing court may take evidence and make findings concerning such matters or may, by order, refer such matters to the trial court for determination."

_____
BROWN, J.

WE CONCUR:


_____
POLLAK, P. J.


_____
TUCHER, J.


*Burch et al. v. Certainteed Corporation.* (A151633, A152252, A153624)

A151633/ Michael B. Burch, et al. v. CertainTeed Corporation


Trial Court:    Superior Court of Alameda County


Trial Judge:    Honorable Winifred Y. Smith


Counsel:  Kazan McClain Satterley & Greenwood, Justin Alexander Bosl, Ted W. Pelletier, Michael T. Stewart, Joseph Donald Satterley, and Arcelia L. Hurtado for Plaintiffs, Appellants and Respondents.

Schiff Hardin and Neil Lloyd; Dentons US, Lisa L. Oberg, Jules S. Zeman, and Jennifer J. Lee for Defendant and Appellant.

Gordon Reese Scully Mansukhani and Don Willenburg for Association of Defense Counsel of Northern California and Nevada; Thompson & Colegate and Susan Knock Beck for Association of Southern California Defense Counsel as Amici Curiae on behalf of Defendant and Appellant.